# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-2654

_____

Ronald D. McNamara,     *

    *

       Plaintiff-Appellee,     *

    *    Appeal from the United States

     v.     *    District Court for the District

    *    of South Dakota.

Yellow Transportation, Inc.,     *

    *

       Defendant-Appellant.     *

_____

Submitted: February 13, 2009
Filed: July 1, 2009

_____

Before LOKEN, Chief Judge, MELLOY and BENTON, Circuit Judges.

_____

MELLOY, Circuit Judge.

Yellow Transportation, Inc. ("Yellow"), terminated Ronald McNamara's employment after more than twenty-three years of service. McNamara filed suit against Yellow alleging retaliation, gender discrimination, and a violation of the Family and Medical Leave Act ("FMLA"). Yellow moved for summary judgment or, in the alternative, for an order to compel arbitration. The district court denied these motions, and Yellow appeals.

We hold that McNamara was not a transportation worker exempted from the Federal Arbitration Act ("FAA"). We also hold that McNamara's dispute was subject to a valid arbitration agreement and that Yellow did not waive its right to arbitrate by

failing to move for arbitration during EEOC proceedings prior to McNamara's filing of this suit. Accordingly, we reverse the district court's denial of Yellow's motion to compel arbitration and remand to the district court with directions to enter a stay holding the case in abeyance pending arbitration.

I.     Background

Yellow hired McNamara in January 1983. Over the years, McNamara worked in several different capacities for Yellow. He served as a Customer Relations Manager in a call center in Sioux Falls, South Dakota, at the time of the events relevant to the present claims.

On October 29, 2001, Yellow instituted a mandatory arbitration program. According to an unrebutted affidavit that Yellow submitted with its motions to the district court, Yellow circulated a two-page arbitration agreement ("2001 Agreement") to its employees via email and via interoffice mail.[1] McNamara does not deny that he

---

[1]The 2001 Agreement provided:

[E]xcept for claims listed . . . as "Excluded Claims;" all disputes, claims or controversies arising out of, or related to your employment or the cessation of your employment with Yellow that would otherwise require or allow resort to a court or other governmental tribunal . . . will instead be resolved exclusively by final and binding arbitration before a neutral arbitrator.

       Employment Claims include, but are not limited to, claims of discrimination, harassment or retaliation and claims for benefits brought against Yellow . . . whether based on local, state or federal laws or regulations, or on tort, contract, or equitable law, or otherwise. By way of example only, Employment Claims include claims under the Age Discrimination in Employment Act, Title VII of the Civil Rights [sic] of 1964, as amended, including the amendments of the Civil Rights Act of

received the 2001 Agreement by either method of delivery. The 2001 Agreement stated that the arbitration process would "become a condition of your employment, effective November 8, 2001," and McNamara continued as Yellow's employee after that date. He did not dispute the applicability of the 2001 Agreement at any time during his employment.

On June 30, 2004, Yellow distributed to its employees, including McNamara, a document entitled "Yellow, a Matter of Respect, Policy Guide to Workplace Conduct" ("Policy Guide"). The Policy Guide contained descriptions of Yellow's policies applicable to union and non-union workers on a wide variety of topics. The Policy Guide included a copy of the 2001 Agreement. The first page of the Policy

---

1991, the Americans with Disabilities Act, the Family and Medical Leave Act, the Employee Retirement Income Security Act, and the Fair Labor Standards Act.
. . .
. . . The arbitration and the Dispute Resolution Process shall be controlled by the Federal Arbitration Act ("FAA"). If for any reason the FAA does not apply or if the FAA is silent on the issue, then the provisions of the Indiana Uniform Arbitration Act . . . shall apply (to the extent they do not conflict with the FAA) and subject Employment Claims to arbitration. . . .
. . .
This Dispute Resolution Process will become a condition of your employment, effective November 8, 2001. By remaining on Yellow's payroll after that date, both you and the Company are agreeing to binding arbitration and giving up the right to trial by jury.

Guide was a disclaimer with a large font, bold-faced header stating "DISCLAIMER."
The balance of the page was in all caps and underlined.[2]

---

[2]The Disclaimer provided:

THIS POLICY GUIDE AND ALL OF THE INFORMATION CONTAINED IN THIS GUIDE, IS INTENDED TO BE AN INFORMATIONAL SOURCE FOR EMPLOYEES. IT IS NOT (AND SHALL NOT BE CONSTRUED TO BE) AN EXPRESS OR IMPLIED CONTRACT BETWEEN THE COMPANY AND ITS EMPLOYEES.

THIS GUIDE IS NOT INTENDED TO INCLUDE ALL COMPANY POLICIES. THE POLICIES DESCRIBED IN THIS GUIDE MAY BE REVISED FROM TIME TO TIME, AND NEW POLICIES THAT ARE NOT INCLUDED IN THIS GUIDE MAY BE ADDED. ACCORDINGLY, THE COMPANY RESERVES THE RIGHT TO CHANGE, SUSPEND, ELIMINATE OR ADD TO ANY AND ALL POLICIES, PROCEDURES, PROCESSES, PRACTICES AND EMPLOYEE BENEFITS, EXCEPT FOR THE "AT WILL" NATURE OF YOUR EMPLOYMENT AND THE DISPUTE RESOLUTION PROCESS. DISTRIBUTION OR OTHER WRITTEN ANNOUNCEMENTS OF CHANGES MAY NOT ALWAYS OCCUR IN ADVANCE OF THE CHANGE.

THE EMPLOYMENT-AT-WILL RELATIONSHIP MAY NOT BE MODIFIED EXCEPT IN WRITING SIGNED BY THE PRESIDENT OF THE COMPANY AND YOU EXPLICITLY STATING THAT THE EMPLOYMENT-AT-WILL RELATIONSHIP IS BEING MODIFIED. THE DISPUTE RESOLUTION PROCESS MAY NOT BE MODIFIED WITH RESPECT TO ANY PENDING MATTER AND MAY BE MODIFIED WITH RESPECT TO FUTURE MATTERS ONLY IF ADVANCE NOTICE OF THE CHANGE HAS BEEN DISTRIBUTED IN A MANNER REASONABLY CALCULATED TO BE RECEIVED BY EMPLOYEES. MANAGEMENT ALSO RESERVES THE RIGHT TO MAKE FINAL DECISIONS CONCERNING THE INTERPRETATION AND APPLICATION OF CORPORATE HUMAN RESOURCES POLICIES, INCLUDING ALL OF THOSE CONTAINED IN THIS POLICY GUIDE.

Following the disclaimer, every page of the Policy Guide included a header that stated, "This Information Applies to All Employees." In addition, every page included a footer that stated "POLICY GUIDE." Pages 16 and 17 of the Policy Guide contained a reproduction of the 2001 Agreement. The only difference between the language set forth on Pages 16 and 17 of the Policy Guide and the 2001 Agreement, as distributed in 2001, was language concerning an effective date and the consequences of remaining an employee after the effective date. In the Policy Guide, this language was truncated and stated only, "The Dispute Resolution Process is a condition of your employment."

Yellow required its employees to sign a form acknowledging receipt of the Policy Guide. McNamara signed the acknowledgment form on June 30, 2004. He then remained Yellow's employee until his termination on June 19, 2006.

While we do not purport to assess the merits of McNamara's substantive claims, we describe both his version and Yellow's version of the termination for context. According to McNamara, he criticized his manager during Yellow's review of the manager, stating that the manager had harassed people within the office and showed favoritism to women. McNamara asserts that the manager discovered the criticism through a violation of McNamara's rights, targeted McNamara for termination, and eventually hired several women to work as Customer Relations Managers following McNamara's termination. According to Yellow, it terminated McNamara for violating its Internet/computer acceptable-use policy and for a "long history of disregard for Yellow's rules and procedures." Yellow alleges in its brief that it provided McNamara "extensive coaching regarding his multiple violations of Yellow's rules and procedures" and issued him a "Notice of Corrective Action" for purportedly creating a hostile work environment.

McNamara submitted a claim to the EEOC, and Yellow did not raise the issue of arbitration during the EEOC proceedings or prior to McNamara's filing of the

present suit. After McNamara filed suit, Yellow moved for summary judgment or for an order compelling arbitration. Yellow supported its motions with an affidavit, copies of the 2001 Agreement, and copies of an email message distributing the 2001 Agreement. Yellow's arguments in support of arbitration relied upon the 2001 Agreement as the contract requiring arbitration. McNamara, in contrast, directed a competing affidavit and his arguments in opposition to Yellow's motions exclusively towards the Policy Guide, making no reference to the 2001 Agreement and failing to dispute any of Yellow's evidence regarding the 2001 Agreement or McNamara's receipt of the 2001 Agreement. The district court also focused on the Policy Guide, making no reference to the 2001 Agreement. The district court resolved Yellow's motions on the briefs and did not hold a hearing. In its order denying the motions, the district court stated, "The question on arbitration is whether or not the Defendant's Policy Guides are contracts." The court held the Policy Guide was not an enforceable arbitration agreement.

II.     Discussion

     A.     Jurisdiction and Standard of Review

We have jurisdiction to review the denial of a motion to compel arbitration as an interlocutory appeal within the scope of 28 U.S.C. § 1292(a)(1). Nordin v. Nutri/System, Inc., 897 F.2d 339, 342 (8th Cir. 1990) ("[The] order . . . has an injunctive effect, and . . . a denial of a motion to compel arbitration can only be effectively challenged on immediate appeal because the advantages of arbitration will be forever lost if the appeal is delayed. Therefore, we have jurisdiction over the court's denial of [the] motion to compel arbitration pursuant to § 1292(a)(1)."). We "review[] de novo a district court's order compelling arbitration, when the decision is based on contract interpretation." Berkley v. Dillard's Inc., 450 F.3d 775, 777 (8th Cir. 2006). "However, to the extent that the district court's order is based upon factual findings, our review is guided by the clearly erroneous standard." Nordin, 897 F.2d

at 344. Here, the district court's order was not based on any factual findings material to our analysis, and, as such, our review is de novo. See Berkley, 450 F.3d at 777.

The questions we must address include whether McNamara was a "transportation worker" exempted from the FAA. If not, we must determine whether the 2001 Agreement is a valid arbitration agreement that encompasses McNamara's claims. Finally, if McNamara's claims are otherwise subject to a valid arbitration agreement, we must decide whether Yellow waived its right to arbitrate McNamara's claims by participating in the EEOC process before first asserting its right to arbitration.

### B.     Transportation Worker

The FAA does not apply to "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. The Supreme Court has interpreted this exemption narrowly, agreeing with the majority of circuits that it "'is limited to transportation workers, defined . . . as those workers actually engaged in the movement of goods in interstate commerce.'" Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 112 (2001) (quoting Cole v. Burns Int'l Sec. Servs., 105 F.3d 1465, 1471 (D.C. Cir. 1997)). In Lenz v. Yellow Transportation, Inc., 431 F.3d 348, 351 (8th Cir. 2005), we applied Circuit City and determined that a "Customer Service Representative" for Yellow who worked at a call center was not a transportation worker.

It is undisputed that McNamara's job title was Customer Relations Manager and that he was a manager or supervisor over Customer Service Representatives at Yellow's Sioux Falls, South Dakota call center. Yellow submitted a description of McNamara's duties via affidavit stating that the call center where McNamara worked was distinct from a nearby freight dock that Yellow described as "a completely

separate facility with a separate manager." Yellow described McNamara's duties as follows:

> As a Customer Relations Manager, Mr. McNamara's primary responsibilities included assisting Customer Service Representatives in identifying and resolving customer issues; managing resources and staffing needs; assisting teams in setting objectives, goals, performance standards and expectations; and maintaining effective communications with employees and other managers. Mr. McNamara had little, if any, interaction with the customers themselves. He did not handle goods that traveled interstate. He was not directly responsible for the transporting of interstate goods, nor did he supervise employees who were directly responsible for the transporting of interstate goods.

McNamara failed to contest, by affidavit or otherwise, Yellow's description of his job. He did allege for the first time in his brief on appeal, without evidentiary support, that certain of his job duties involved a greater degree of customer contact and troubleshooting than suggested by Yellow's description. We cannot rely, however, on unsupported factual allegations raised for the first time in an appeal brief. See, e.g., Kerr v. FEMA, 113 F.3d 884, 886 n.3 (8th Cir. 1997) ("Not only has [the appellant] raised this argument for the first time on appeal, but he has also neglected to support this allegation with any specific law or facts from the record.").

Further, even if we could consider McNamara's unsupported description of his job duties, we see no material distinction between his allegations and Yellow's description of his job duties. His allegations vaguely allege some interaction with shipping customers but do not show that his duties differed materially from the Customer Service Representatives whom he supervised (except for the fact that he was a supervisor or manager over them). In fact, in his brief, McNamara relies upon the district court's opinion in Lenz rather than our opinion reversing the district court in that case. See Lenz v. Yellow Transp., Inc., 352 F. Supp. 2d 903, 906–09 (S.D. Iowa 2005) (holding that a customer service representative for Yellow was a transportation

-8-

worker under the FAA), rev'd, 431 F.3d 348. As such, McNamara actually argues that his duties were similar to the duties of the plaintiff in <u>Lenz</u>. He states, "Essentially, if Mr. McNamara and Lenz had worked in the same office, he would have been Mr. Lenz's boss. So clearly, Mr. McNamara's job duties were similar to that of Mr. Lenz but just extended themselves to include the management of people." For the purpose of applying <u>Circuit City</u>, then, McNamara asserts no material difference in duties between McNamara as a supervisor and the plaintiff in <u>Lenz</u> as the type of employee McNamara supervised. As such, <u>Lenz</u> directly controls our decision on this issue, and we conclude McNamara was not a transportation worker exempted from the FAA. <u>Lenz</u>, 431 F.3d at 352–53.

C.     2001 Arbitration Agreement

The parties agree that, in this case, the questions of whether they are subject to a valid arbitration agreement and whether such an agreement encompasses their claims are questions for the court. The parties also agree that we apply South Dakota law to determine whether McNamara and Yellow were subject to a valid arbitration agreement. <u>See, e.g.</u>, <u>First Options of Chicago, Inc. v. Kaplan</u>, 514 U.S. 938, 944 (1995) (applying state law to determine whether parties had agreed to arbitration); <u>Patterson v. Tenet Healthcare, Inc.</u>, 113 F.3d 832, 834 (8th Cir.1997) (applying state contract law to determine whether a binding contract to arbitrate exists). South Dakota law provides, "Elements essential to existence of a contract are: (1) Parties capable of contracting; (2) Their consent; (3) A lawful object; and (4) Sufficient cause or consideration." S.D. Codified Laws § 53-1-2; <u>see also</u> <u>Mueller v. Cedar Shore Resort, Inc.</u>, 643 N.W.2d 56, 70 (S.D. 2002). McNamara contests only the issues of consent or acceptance and consideration.

Applying the laws of other states, we have held that continued employment after an employer imposes a term or condition upon employment demonstrates the acceptance and consideration necessary to form an enforceable contract. <u>See, e.g.</u>,

Berkley, 450 F.3d at 777 ("By continuing her employment, [the employee] accepted the terms of the arbitration program."); Winfrey v. Bridgestone/Firestone, Inc., 205 F.3d 1349 (unpublished table decision), 1999 WL 1295310, at *1 (8th Cir. 1999) ("[W]here an at-will employee . . . retains employment with knowledge of new or changed conditions, . . . retention of employment constitute[s] acceptance of the offer of a unilateral contract; by continuing to stay on the job, although free to leave, [the employee] supplie[s] the necessary consideration for the offer, and agree[s] to be bound by the Plan's mandatory arbitration provision." (internal citation and quotation omitted)). The 2001 Agreement expressly stated that continued employment with Yellow would operate as acceptance of the 2001 Agreement. Supra at n.1. McNamara, in fact, continued to work for Yellow for approximately five years after receiving the 2001 Agreement. As a result, his continued employment served as acceptance and consideration.

Although the South Dakota Supreme Court has not directly addressed this issue, the parties identify no authority suggesting that it would adopt an opposite position. It is the well-established law of contracts in several Eighth Circuit states, and we can discern no likelihood that South Dakota would deviate from this rule. See, e.g., Johnston v. Panhandle Coop. Ass'n, 408 N.W.2d 261, 266 (Neb. 1987) (stating that continuation of employment by at-will employee following change in conditions of employment serves as acceptance and consideration); Pine River State Bank v. Mettille, 333 N.W.2d 622, 627 (Minn. 1983) (same). Further, to the extent there might be any doubt as to the sufficiency of continued employment as consideration for an arbitration agreement in South Dakota, the parties' mutual agreement to relinquish trial rights serves as adequate alternative consideration in this case. See S.D. Codified Laws § 53-6-1 ("Any benefit . . . agreed to be conferred upon the promiser . . . or any prejudice . . . agreed to be suffered by such person . . . as an inducement to the promiser, is a good consideration for a promise."). Accordingly, we hold that the 2001 Agreement was a valid contract.

-10-

McNamara argues that the Policy Guide governs the parties' relationship and that it does not rise to the level of an enforceable contract. He also argues that, given the disclaimers present in the Policy Guide, inclusion of the 2001 Agreement within the Policy Guide stripped the 2001 Agreement of contractual status. McNamara's arguments are unavailing. By its unambiguous language, the Policy Guide was merely informational and more than adequately disavowed not only any pretension of serving as a contract but also any claim to alter existing contracts. Because the Policy Guide was not itself a contract and in no way altered the 2001 Agreement, the 2001 Agreement governed the relationship between McNamara and Yellow at the time of McNamara's termination in 2006.

As to the issue of scope, McNamara does not appear to contend seriously that the subject matter of the present dispute lies outside the scope of the arbitration requirements of the 2001 Agreement. The 2001 Agreement expressly encompasses discrimination, retaliation, and harassment claims and explicitly references federal civil rights statutes and the FMLA, all of which McNamara relies upon in his complaint. In addition, we have recognized the permissibility of subjecting employment-related civil-rights claims to arbitration. See Patterson, 113 F.3d at 837–38 (holding that Title VII claims could be subject to arbitration); see also Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 35 (1991) (holding that ADEA claims could be subject to arbitration). Given the strong federal policy favoring arbitration, we conclude McNamara's claims fall within the scope of the 2001 Agreement. See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24–25 (1983) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . .").

D.     Waiver

McNamara argues that by failing to raise the issue of arbitration at an earlier time, Yellow waived its right to arbitrate the current claims. He also argues that he

may be prejudiced by Yellow's purported untimeliness because, although Yellow asks our court to compel arbitration, Yellow intends to argue to the arbitrators that a contractual time limit bars arbitration. According to McNamara, Yellow's dual arguments may leave him entirely without a forum in which to resolve his claims. For the reasons set forth by the First Circuit in Marie v. Allied Home Mortgage Corp., 402 F.3d 1, 15–16 (1st Cir. 2005), we reject McNamara's waiver argument. To prevent the complete loss of a forum, however, we direct the district court on remand to enter a stay thus retaining jurisdiction to ensure a forum for McNamara's claims in the event the arbitrators hold a contractual or procedural limit bars arbitration. See Howsham v. Dean Witter Reynolds, Inc., 537 U.S. 79, 85–86 (2002) (stating that the issue of whether a time limit in the applicable arbitration rules barred an arbitration claim was a question to be addressed in the first instance by the arbitrators rather than the court); see also 9 U.S.C. § 3 (authorizing a stay of proceedings pending arbitration).

In Marie, the First Circuit addressed the question of "whether an employer waives its contractual right to compel arbitration of a Title VII claim by not filing for arbitration when the employee initiates an EEOC complaint, but instead waiting and only moving to compel arbitration after the employee later files a civil claim in federal court." Marie, 402 F.3d at 3. The court relied primarily upon an efficiency argument in holding that an employer's participation in EEOC proceedings without making an arbitration request did not reflect a desire to waive arbitration rights. Id. at 13. As support, the court cited EEOC v. Waffle House, Inc., 534 U.S. 279 (2002), a case where the Supreme Court held that an "employer cannot stop the EEOC, a third party, from bringing a public enforcement action against an employer by invoking an arbitration agreement between the employer and the relevant employee." Marie, 402 F.3d at 15 (describing Waffle House). Marie held that because an employer could not stop a preliminary EEOC investigation by invoking arbitration, "forcing employers to bring arbitration during the pendency of EEOC investigations [would be] a waste of resources . . . and [would be] contrary to the general purposes of the FAA." Id. at

-12-

16. The court further concluded that, even after resolution of a preliminary EEOC investigation in favor of the employer, a failure by the employer to seek arbitration would not constitute waiver. Id. at 17 ("We will not force the employer to make a wasteful, preemptive decision to arbitrate when it has no idea whether a dispute will still exist. . . . [I]n general there is no need for the non-complaining party, the employer, to make a pre-suit demand for arbitration ." (internal quotation omitted)). This is a sensible outcome given that not every employee will persist in pressing a claim after adverse resolution of EEOC proceedings.[3]

Finally, we do not believe the rationale in Marie that we adopt today precludes further litigation between the present parties in the event that Yellow might prevail on its argument in arbitration that McNamara has contractually or procedurally defaulted on his arbitration claim. That issue is not before us in the present appeal. As indicated, we recognize that it may arise in the present dispute, however, and as such, we direct the district court on remand to enter a stay and retain jurisdiction pending arbitration.

Accordingly, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

_____

---

[3]The court in Marie referred to an Eighth Circuit case, National American Insurance Co. v. TransAmerica Occidental Life Insurance Corp., 328 F.3d 462, 466 (8th Cir. 2003), in which we declined to rule on a waiver issue that was related to the impact of the parties' participation in an earlier proceeding. Marie, 402 F.3d at 12. In National American, we deferred to arbitrators to address in the first instance a question of whether a party had waived its arbitration rights based on its prior conduct. Nat'l Am., 328 F.3d at 466. Here, although the parties argue the issue of waiver, neither party suggests that it would be appropriate on the facts of this case to reserve this question of waiver for the arbitrators to address in the first instance. Accordingly, we need not address the finer points of when courts are and are not bound to honor parties' requests to reserve questions of waiver for resolution by arbitrators.